· [Civ. No. 15031.   First Dist., Div. Two.   May 16, 1952.]

Guardianship of the Person and Estate of KENNETH PETER MacLEAN, a Minor.   LOTTIE GOTTLIEB, Appellant, v. KENNETH A. MacLEAN, Respondent.

John R. Golden for Appellant.

Anthony S. Devoto for Respondent.

GOODELL, J.—The minor is the son of respondent and his deceased wife.   The parents had been divorced, with custody of the minor awarded to his mother.

Mrs. MacLean died in March, 1950, and on April 17, 1950, respondent was appointed guardian of the person and estate of the minor who was then 13. Mrs. MacLean and appellant were sisters.

From the time of respondent's appointment (and before that) the minor was unfriendly toward him; his attitude challenged respondent's authority as father and guardian. The minor was living in the household of appellant, who shared this attitude. The situation became so strained that in July, 1950, the father as guardian filed in this court a petition for a writ of habeas corpus to obtain the custody of the minor. At the hearing on the writ on August 14, 1950, the minor appeared before us (without counsel) and it was apparent that he rebelled against living with his father or having anything to do with him. The father had remarried and was living in Oakland. It appeared also that the minor would reach the age of 14 on December 23, 1950, when of course he could name his own guardian. We dismissed the habeas corpus proceeding and things remained as they were for the ensuing four months.

On the minor's 14th birthday he nominated appellant as guardian of his person and estate and three days later, on December 26, she filed in the Superior Court in San Francisco, where the guardianship was pending, a petition for letters of guardianship based on the nomination.

At the hearing the following month respondent, who was still guardian, opposed the approval of the nomination. The court denied appellant's petition and this appeal was taken.

Section 1406 Probate Code provides that the nominee "must be appointed if approved by the court" and *Guardianship of Kirkman*, 168 Cal. 688, 690 [144 P. 745], holds that in such cases "The discretion of the court can be exercised only in the determination of the question whether the nominee is a 'suitable person.' " That being so, the only question now presented is whether there was an abuse of discretion.

The court wrote an opinion wherein numerous reasons were given for its action, but it is not necessary to quote at any length from either the opinion or the findings.

We are satisfied that there are at least two grounds, regardless of any others there may be, upon which it must be held that this record shows no abuse of discretion.

In the memorandum opinion the court, in speaking of the earlier proceedings said: "It is fair to state that petitioner

has, without cause or justification, and by her own admission, thrown every possible obstacle in the way to prevent the father from obtaining the physical custody of the minor to which he is entitled. Her appeals, subsequently dismissed, were patently frivolous and are typical of the tactics to which she has resorted to balk the execution of the order of the court, which she has contemptuously ignored, and she in fact testified that she had done everything she could to prevent the father from obtaining the custody to which he was legally entitled.''

That statement was based on the history of the proceedings pending before the same judge from April, 1950, to January, 1951. It was also unquestionably based in part on the following testimony which the appellant with the utmost frankness gave under cross-examination at the hearing:

''Mr. Devoto: Q. I am asking you, didn't you repeatedly ignore and disregard the court order? A. Yes, on legal advice . . .

''Q. You knew of the order appointing the father guardian pending the appeal? A. Yes.

''Q. And you did everything to ignore and disregard that order, didn't you? Isn't that correct? A. Yes——

''Mr. Golden: This is all calling for a conclusion, and argumentative.

''The Court: Well, it would go to the question of whether she prejudiced the mind of the boy or not, and I think this evidence is admissible on that subject . . .

''Mr. Devoto: Q. If you didn't consider yourself beyond and above the law, why didn't you obey those orders and turn the custody of the boy over to the father—answer that question. A. Because Peter didn't want to go to his father. I was fighting for Peter.

''Q. That is your only reason? A. That is the only reason.

''Q. You don't think you should have given any more respect to a court order than that? A. No, sir. Peter was at stake, not the Court.''

On the same subject the court found: ''That at all times herein mentioned said Lottie Gottlieb has contemptuously ignored the order of this court appointing said father such guardian, and has, without cause or justification, thrown every possible obstacle in the way to frustrate said father in obtaining the physical custody of said minor . . . that as a direct result thereof, said father was at all times deprived of the actual custody and possession of said minor.''

It should be borne in mind that appellant was testifying in support of her own petition to become guardian in a proceeding wherein the only question before the court was her suitability to administer that trust as an officer of the court, the orders of which she frankly admitted flouting. The court in ruling said that appellant's attitude bore on the question "whether she prejudiced the mind of the boy or not," but, more than that, it was an index of her lack of amenability to the authority of the court of which she purposed becoming a sworn officer in a highly trusted relation. We find no abuse of discretion on this count.

In the opinion the court also said: "In addition to the personal unfitness of petitioner to be appointed guardian of this minor, the court also considered that there is real estate involved in this proceeding which formerly stood in the name of the minor's mother, and which now stands in the name of petitioner, Lottie Gottlieb. This property is the house in which the mother of the minor lived for many years, and in which it may be presumed the minor has a beneficial interest. Petitioner has stated in open court that this property belongs to her, and therefore has an interest adverse to the minor, who obviously could not be adequately represented by petitioner in litigation to assert his interest."

And on the same subject the court found: "That said Lottie Gottlieb is interested in certain improved real property . . . adversely to the interest of said minor, which property said Lottie Gottlieb claims to have been deeded to her by said minor's mother, a few days before, or on the day of, the death of said mother, the validity of which deed said father as such guardian questions and intends to have determined in appropriate legal proceedings."

Appellant testified that the property was hers and had stood in her name, but that for a reason of her own she had put the title in the name of Mrs. MacLean. When Mrs. MacLean was on her deathbed appellant got her to deed the property back to her. During cross-examination appellant was told by respondent's counsel that a suit was to be brought respecting this property, and in the briefs we are told that such suit has since been brought by the special administratrix of Mrs. MacLean's estate. If the estate prevails obviously Peter as an heir of his mother will have a substantial interest in the property. Appellant's assertion that the property is hers presents a clear-cut conflict of interests between appellant and the minor. We find no abuse

of discretion on this count. (See *Estate of Bedford,* 158 Cal. 145 [110 P. 302].)

In the opinion filed by the court it is said: "It is . . . the opinion of this court that the best interest of the minor will be served by his remaining under the guardianship of his father . . ." The formal order says nothing with respect to a continuance of the guardianship in the father, and indeed that question was not before the court. The only question was the approval or disapproval of the minor's nominee. Under section 1406 as it now reads it would seem that on the denial of this approval the minor has the right to make another nomination which if made must again be submitted for judicial approval.

The order appealed from is affirmed. Further ordered that the costs incurred by appellant for the preparation of that part of the reporter's transcript consisting of the second section be taxed against the respondent in his individual capacity and not as guardian.

Dooling, J., concurred.

NOURSE, P. J.—I dissent upon the ground that neither the petitioner nor the minor was accorded a fair or impartial trial. The order appealed from was the result of religious intolerance and judicial indiscretion. The interests of the minor were not considered at any stage of the proceeding and are given no consideration in Justice Goodell's opinion of affirmance.

In the year 1940 the minor's mother was divorced from the father on the ground of the latter's cruelty. Custody of the child, then about 4 years of age, was given to the mother and the father was ordered to pay $7.00 a week for his maintenance. Immediately upon the death of the mother the father stopped such payments and since that time, March 13, 1950, he has not paid anything whatever for the support, education or maintenance of his son except the sum of $150 for tuition in the St. Joseph's School. All other expenses have been paid by the appellant herein.

Almost coincident with the divorce in 1940 the petitioner herein, who was the sister of the deceased and the aunt of the minor, provided a home for her invalid sister, the minor involved herein, and a daughter of the sister by a previous marriage. The mother had frequently expressed the desire that the son should be raised as a Catholic and had placed

him in a Catholic school in San Francisco for religious training. The petitioner herein was a Jewess. She was insulted, threatened, intimidated and abused throughout the hearing.

The trial court assumed without reason that the petitioner had placed the minor in this Catholic school to "sequester" him from his father and to unjustly influence the court through religious pressure. That there was no justification for this assumption will appear later. This was the second hearing relating to the guardianship of the minor. On the previous hearing the father had been appointed guardian and the application of the aunt had been denied. The hearing had been conducted with great bitterness and because of that counsel for the petitioner in this proceeding urged the court to transfer the proceeding to another department where they could have a fair and impartial trial. The motion was denied. It should have been granted. The order under appeal was not made with any consideration for the welfare of the minor but it was sought and granted to enable the father to take the minor out of the Catholic school he was attending and to compel him to move to his father's home in Oakland, there to attend the public schools. The persistence of the minor in his desire to continue his religious and clerical education followed by study for the priesthood angered the court and the father. These circumstances explain the otherwise inconceivable findings of facts which are not supported by any competent evidence.

It was found that "The present petitioner appealed from the order of this Court awarding letters of guardianship to the father. She also appealed from the order of this Court awarding custody of the minor to the father pending the determination of the first appeal. Both of these appeals, being wholly without merit, as petitioner at all times well knew, were voluntarily dismissed by her." A cursory examination of the record on the former appeal (which however is not properly a part of this record) shows that the appeal was far from being "wholly without merit." In fact it shows that there was very substantial merit in it. But the appeal was considered a reflection on the court for which the appellant was denounced and penalized in this proceeding.

It was found that "*In defiance* of the order of this Court appointing the father as guardian, the petitioner herein then *sequestered* the minor in a seminary in Santa Clara County, that thus the father might be further frustrated in obtain-

ing possession of his boy." The evidence is wholly to the contrary. Let us look at the record. The minor, on cross-examination, testified: "Q. How did you happen to enter that academy? A. Before that I talked to Father Davenport, and I had gone with other boys who were going down there, and I decided then that I wanted to go. Q. Did anybody advise you to enter the academy? A. No, sir. I went to a Catholic school, and I thought for myself whether I wanted to go or not. Q. You did that of your own will? A. Yes. Q. Nobody advised you to do it? A. No, sir. Q. Your aunt, Miss Gottlieb, didn't advise you to go into this academy, did she? A. No, sir. Q. She didn't ask you to enter this academy so that you couldn't get into the custody of your father? A. No, sir. Q. When you were down there in this academy, you wrote a letter to your father, did you not? A. He wrote a letter to me first. Q. He wrote a letter to you first? A. Yes. Q. Then you answered, did you not—you answered him? A. Yes." On further examination it developed that his aunt, the petitioner herein, paid all but three months of his tuition as well as all the expenses of food, clothing, medical care and spending money. The father has paid nothing for the support or maintenance of the minor since his mother died in March, 1950. We should read further in this cross-examination of the minor: "Mr. Devoto: Q. When did you decide to become educated for the priesthood? A. Sir, I decided when I was in the 8th grade, and I thought about it, and I asked my mother, but my mother really didn't have a chance to think about it. Q. You were on the witness stand in the guardianship proceedings and you made no statement at that time that you wanted to enter the priesthood, did you? Mr. Golden: I will object to that. I will object to the form of the question. This is an attempt to impeach him, and we ought to find out where there is something occurring in the transcript, or where he was asked that and didn't give that answer. The Court: Well, that objection would ordinarily be good, but in a proceeding of this kind, where we want to get at the boy's intention, and when he made up his mind—he didn't say in any proceeding here before that he wanted to be a priest. That was one of the things that they set up when this matter was before the Appellate Court. I will allow it. I think it should all be brought out."

The reference to the proceeding in the appellate court is to a petition in habeas corpus brought by the father to gain

immediate possession of the minor. The father was represented by counsel, the minor appeared in propria persona. When it appeared to us that the minor desired to enter the seminary, that he would lose all the advantages of his prior studies if the father had his wish to prevent it, and that in a few months the minor would have reached the age when he could choose his own guardian, the judges of this court dismissed the petition. The trial judge openly resented our action and held it to the prejudice of the petitioner in this proceeding.

It was further found: ''It is fair to state that petitioner has, without cause or justification, and by her own admission, thrown every possible obstacle in the way to prevent the father from obtaining the physical custody of the minor to which he is entitled.'' This is really the meat of the controversy. It is the ground upon which my associates affirm the order. The point is that since the appellant and the minor resisted the efforts of the court to thwart the ambition of the minor to study for the priesthood both should be forced to knuckle down to the orders of the court without regard for the moral or temporal welfare of the minor. In a proceeding of this kind the interests of the minor are the real issue. Here the minor had voluntarily chosen to attend a Catholic seminary to study for the priesthood. It had been the wish of his mother. The father objected and wanted to take him out and put him in the public schools. The court approved the father's action. The resentment against the minor's choice of a religious education is inconceivable. However, the petitioner sided with the boy and told the court in explanation of her conduct that she was ''fighting for Peter'' that ''Peter was at stake, not the Court.'' Thereupon she lost her case. But as to the facts, both the petitioner and the minor testified on numerous occasions that the petitioner had frequently told the minor that he could go to his father whenever he desired to do so, that the refusal of the minor to do so was a matter of his own choosing and was caused by his religious and clerical education in the seminary at Mountain View. (Pending the appeal and because of this opposition, the boy has been forced to drop out of the institution.)

It was further found: ''It is apparent that the minor herein is not of strong character for his age, and that petitioner has taken advantage of this moral weakness to poison his mind against his father, and to procure from him her own nomination. Under the circumstances it is evident that the minor

was not acting freely and voluntarily in signing the nomination, but did so as a result of the domination and undue influence exercised over him by petitioner." The only evidence touching the "moral weakness" of the minor is that showing his set determination to continue his religious studies in opposition to the demands of his father to gain possession of his person and estate for monetary reasons. As to the rest of the finding all the evidence is directly contrary.

The court then referred to the "personal unfitness of the petitioner." It is not clear upon what this statement is based. The father did not appear in the proceeding. He was represented by counsel who made many statements of facts outside the record, but who was not sworn as a witness. The only evidence of personal fitness is that found in the testimony of the petitioner and of the minor. Certainly none of that testimony showed personal unfitness. To the contrary the evidence is that for more than 18 years the petitioner has been conducting her own business in which she has had a good reputation and which has yielded her approximately $400 a month; that she acquired a home into which she moved her divorced sister and the two children and where she supported them for approximately 12 years. At the time of the hearing she was paying the minor's tuition in the academy, all expenses of his board, lodging, clothes, medical and dental bills, and provided a home during the vacation period. The father was paying nothing.

This court has put up a straw man in relation to the litigation over the home property which appellant had purchased and deeded to her sister after the divorce. Such litigation would be under the control of the administrator of the sister's estate. The guardian of the minor could do nothing, at least without the sanction of the court.

The foregoing statement of facts presents the legal question involved in the appeal—the power of the court to arbitrarily reject a guardian nominated by a minor of the age of 14 years when such action may wreck the whole life of the minor. In a proceeding of this kind the minor is the real party in interest though his nominee is the nominal petitioner. The real issue, therefore, is the *moral and temporal welfare of the minor.* This is made clear by the words of the statute. Here the welfare of the minor was not given the slightest consideration by the lower court, nor by the majority of this court. The right of the minor is statutory. Section 1406 of the Probate Code provides: "In appointing a general guardian of a minor, the court is to be guided by what appears to be for the *best*

*interest of the child in respect to its temporal and mental and moral welfare. . . . If the child . . . is over fourteen years* of age, he may nominate his own guardian, either of his own accord or within ten days after being duly cited by the court; and such nominee must be appointed if approved by the court.'' (Italics added.) The section is based on the former section 1749 of the Code of Civil Procedure which contained the provision: ''If the guardian nominated by the minor is not approved by the court, . . . the court or judge may nominate and appoint the guardian in the same manner as if the minor were under the age of fourteen years.'' This portion of the section was omitted when section 1406, Probate Code, was enacted in 1931 so that the power of the court to reject the nominee of the minor and appoint one of its own selection no longer exists. The proper procedure under the new section is that if the minor's nominee is rejected by the court for some *judicial* reason the court should forthwith notify the minor to make another nomination within the ten-day period mentioned in the section. The court has no power to appoint a guardian of its own choice or to continue in office one formerly appointed against the objection of the minor. (*In re Guardianship of Kerr*, 29 Cal.App.2d 439, 441 [85 P.2d 145]; *Collins* v. *Superior Court*, 52 Cal.App. 579, 581 [199 P. 352]; 25 Am.Jur. p. 24; 39 C.J.S. pp. 26, 27.)

The applicable rule is clearly and succinctly stated in *Collins* v. *Superior Court, supra*, pp. 580, 581: ''He [the minor] is fourteen years of age, and has the absolute right to select and nominate his guardian, who, if approved by the court, must be appointed. (Code Civil Proc., sec. 1748; *Guardianship of Kirkman*, 168 Cal. 688 [144 P. 745]; *Guardianship of Meiklejohn*, 171 Cal. 247 [152 P. 734]; *Guardianship of McSwain*, 176 Cal. 287 [168 P. 117].) These cases are also authority for holding that a minor, upon arriving at the age of fourteen years, may nominate and displace a guardian already appointed, and that, even though the displaced guardian may be one of his parents. 'The whole scheme,' says the court, in discussing the provisions of the Code of Civil Procedure relating to the appointment of guardians, 'contemplates the absolute right of the minor to have a guardian of his own selection after he is fourteen years of age, provided always, he selects a person who is, in the judgment of the court, a suitable person to act as his guardian. The discretion of the court can be exercised only in the deter-

mination of the question whether the nominee is a "suitable person." ' (*Guardianship of Kirkman, supra.*)

"To uphold the contention of the respondent would be to deny the minor the exercise of this absolute right."

There is evidence that the mother of the minor left an insurance policy of which the minor is a beneficiary in the sum of about $1,000. At a subsequent hearing the trial court, with threats of contempt and immediate imprisonment, forced appellant to turn the policy over to counsel for respondent though it was the expressed wish of the mother that it be allowed to accumulate and be used for the minor's education. We are told in one of the briefs that pending the appeal the proceeds of the policy have been collected by respondent and it is a natural assumption that they will be consumed by guardianship and counsel fees as that appears to be the only interest the father has in his son. The proceeds of the policy should be preserved for the benefit of the minor. Hence the costs herein should be charged to the respondent individually and should not be taxed to the guardianship estate. Furthermore, in all fairness to the minor and to the appellant herein the proceedings should be transferred to another department of the superior court.

Another matter calls for attention. A petition for letters accompanied by the minor's written consent and nomination was filed by the maternal aunt of the minor. No pleadings were filed by the father but his attorney appeared in opposition to the petition. A hearing was conducted with the aunt and minor as the sole witnesses. No other testimony or evidence was offered. Following the adverse judgment the petitioner appealed and notified the clerk to prepare a transcript under rule 5(a), Rules on Appeal. Thereafter counsel for the father, purporting to act under rule 5(b), requested the clerk to include in the transcript the reporter's transcript of testimony at a hearing on the father's petition for letters had on April 3, 1950. This transcript was not introduced in evidence in the present hearing and is not a proper part of the transcript on appeal herein. Rule 5(b) of the Rules on Appeal authorizes the respondent to request the clerk to include in the transcript "additional papers or records, including the clerk's minutes, any written opinion of the superior court, and exhibits either admitted in evidence or rejected. . . ." The clear purpose of this rule is to permit the respondent to procure the inclusion in the clerk's transcript of papers, records and exhibits which were offered in

evidence during the trial or rejected when such documents have been omitted from the notice filed with the clerk by the appellant. It does not permit the respondent to include papers, records, exhibits or anything else which were not before the trial court and which are wholly foreign to a proper record of the proceedings which are under review. For this reason the appellant should be reimbursed for the cost of that portion of the transcript.

The order should be reversed with directions to grant the petition as prayed.

A petition for a rehearing was denied June 14, 1952, and the following opinion was filed:

THE COURT.—It appearing that on the preparation of the record on appeal respondent served on appellant and filed with the clerk "a notice designating additional papers or records . . . to be included in the record on appeal" (Rule 5(b)), the same consisting of the reporter's transcript of testimony taken at the hearing in proceeding numbered 117096, and that the second section of the reporter's transcript herein consisting of pages 1 to 95 inclusive was not necessary or proper in the presentation of this appeal,—

It is ordered that the judgment filed herein on May 16, 1952, be and it is amended as above printed.

Appellant's petition for a hearing by the Supreme Court was denied July 15, 1952. Schauer, J., was of the opinion that the petition should be granted.